**OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, Wood–Chuck Leasing, Inc., Mark Dudgeon, and John E. Neidig, Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**MAYFLOWER TRANSIT, INC., Defendant.**

**Nos. IP98–0457–C–B/S, IP98–0458–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Aug. 23, 2001.

David J. Carr, Ice Miller, Indianapolis, IN, Paul D. Cullen Sr., Cullen & O'Connell, Washington, DC, for plaintiffs.

James A. Calderwood, Zuckert Scoutt & Rasenberger, Washington, DC, David C Campbell, Bingham Summers Welsh &

Spilman, Indianapolis, IN, David Wells Thompson Coburn LLP, St. Louis, MO, for defendant.

## ENTRY ON DEFENDANT'S MOTION TO DISMISS

BARKER, District Judge.

### I. *Introduction.*

These cases involve claims arising under federal truth in leasing regulations and Indiana common law. The two cases were previously consolidated for discovery purposes and are here consolidated for the purpose of addressing defendant's motions to dismiss the cases on the basis of three legal issues that are common to both.

The plaintiffs are putative classes consisting of independent owner-operators of tractors and/or trailers who haul property over the nation's highways.[1] We refer to them here collectively as "owner-operators." The defendant Mayflower is an "authorized carrier" under federal law. The owner-operators in Case No. 0457 allege that Mayflower, through lease agreements with its agents, unlawfully kept moneys that had been maintained in escrow accounts that were properly owing to them after the lease agreements expired. The plaintiffs in Case No. 0458 allege that Mayflower, through lease agreements with its agents, unlawfully over-charged them for insurance products that they purchased through Mayflower's agents. While the plaintiffs in Case No. 0457 seek monetary damages as well as declaratory and equitable relief, the plaintiffs in Case. No. 0458 seek only declaratory and equitable relief.

The cases are before the Court on Mayflower's motions to dismiss both cases pursuant to Fed.R.Civ.P. 12(b)(6). Notwithstanding the presence in Case No. 0457 of two plaintiffs not named in Case No. 0458 and notwithstanding the difference in the relief sought by the plaintiffs in the two cases, Mayflower's arguments for dismissal are all but identical in both cases. Mayflower presents three arguments in support of its motions. First, the plaintiffs do not have a private right of action under the truth in leasing statute or its governing regulations. Second, a ruling on the underlying merits of the two cases should be undertaken first by the Department of Transportation, Federal Highway Administration (FHWA) pursuant to the doctrine of primary jurisdiction. Finally, Mayflower alleges that, since it is not a signatory to any lease agreement presented by the plaintiffs, it cannot be held liable for any of the alleged violations or breaches. For the reasons that follow, Mayflower's motions to dismiss are DENIED as to both cases.

### II. *Standard of Review On Defendant's Motion to Dismiss.*

A party moving to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) bears a weighty burden. It must show that the pleadings themselves fail to provide a basis for any claim for relief under any set of facts. *Ed Miniat, Inc. v. Globe Life Ins. Group Inc.*, 805 F.2d 732, 733 (7th Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2

---

**1.** The plaintiff classes are slightly different in the two cases. Individually named plaintiffs in Case No. 0457, Wood–Chuck Leasing and Mark Dudgeon, are not named plaintiffs in Case No. 0458. Otherwise, the parties in the two cases are the same. It might also be noted that, in Case No. 0457, one plaintiff appears as "John E. Neidig" in the caption, while a named plaintiff appears in Case No. 0458 as "John E. Neidigm." We will assume until further notice from the parties that these are the same person and that the error crept in because of the proximity of the "m" key to the comma "," key on the key-board. Consistent with the briefing, we refer to him throughout as "Neidig."

L.Ed.2d 80 (1957). 5A Charles A. Wright and Arthur R. Miller remind us that:

> As a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief. In other words, dismissal is justified only when the allegations of the complaint itself clearly demonstrate that plaintiff does not have a claim.

*Federal Practice & Procedure: Civil* § 1357. *See Berthold Types Ltd. v. Adobe Systems Inc.*, 242 F.3d 772, 774 (7th Cir. 2001). On a Rule 12(b)(6) motion, we treat all well-pleaded factual allegations as true and we construe all inferences that reasonably may be drawn from those facts in a light most favorable to the party opposing the motion. *Szumny v. American General Finance*, 246 F.3d 1065, 1067 (7th Cir. 2001); *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir.2001).

### III. Statement of Facts Pertinent to Mayflower's Motions

Here, as is appropriate on a 12(b)(6) motion, the facts are not much in dispute, at least with respect to Mayflower's first two theories of dismissal in both cases. As to Case No. 0457, the Owner–Operators Independent Drivers Association (OOIDA) is an association of individuals who own or control truck tractors and who haul property on the nation's highways. The owner-operators act as independent contractors who lease their equipment and services to motor carriers authorized by the DOT to contract with shippers for the transport of property. Complaint ¶¶ 4, 31. Mayflower is such an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a). Mayflower provides transportation services to consumers under DOT's governing authority. Complaint ¶¶ 6–8.

Owner-operators such as the plaintiffs and carriers such as Mayflower enter into lease agreements which are governed by federal law, 49 U.S.C. §§ 14102 et seq., and DOT regulations, 49 C.F.R. Part 376. Complaint ¶ 4. Sometimes, as here, owner-operators enter into lease agreements not directly with the carrier, but with the carrier's authorized agents. Complaint ¶¶ 6–8. As an authorized motor carrier, Mayflower is required by federal law to assume responsibility for its agents' actions with respect to the services provided by the agents on Mayflower's behalf. Complaint ¶¶ 14, 15.

All of the lease agreements into which the plaintiffs have entered with Mayflower's agents include provisions for two accounts: a "Cash Deposit Account" and a "fuel-credit account." During the term of the lease, owner-operators contribute portions of their compensation to the Cash Deposit Account as a security deposit in order to cover amounts that may have been advanced to the owner-operator or amounts that Mayflower (or its agent) may have incurred in obligations on the owner-operator's behalf. Complaint ¶ 33. The Cash Deposit Account is an escrow account regulated by federal law. 49 C.F.R. § 376.12(*l*). Complaint ¶ 36.

The purpose of the fuel-tax credit account is to distribute to the respective states the amounts that each owner-operator owes in fuel taxes to each state in which he consumes fuel. Each state imposes a fuel tax based on the amount of fuel *consumed* in the state and not on fuel *purchased* within the state's borders. In practice, a driver traveling from east to west may purchase fuel in state 1, travel through state 2 without purchasing fuel, and then refuel in state 3. If fuel taxes were based on the state of *purchase*, state 2 will have received no tax, even though the driver will have *consumed* considera-

ble fuel in passing through it. Moreover, just as the driver has "underpaid" taxes in state 2, he has "overpaid" in states 1 and 3, the states in which he has actually purchased fuel. The fuel tax credit is a means of adjusting the payment of taxes to the respective states on a fleet wide basis by having the carrier (here Mayflower) accrue and distribute the taxes to all of the interested states fleet wide. Complaint ¶ 34. Pursuant to the lease agreements, the owner-operators are entitled to a monthly accounting of the over and under-payments. Complaint ¶ 35. The owner-operators are also entitled to a refund of the unexpended portion of the fuel tax credits after the lease expires. Complaint ¶¶ 36–38.

Plaintiffs in Case No. 0457 allege that they received neither an accounting nor a final settlement of the moneys collected in the cash deposit escrow funds and did not receive the moneys collected in the fuel tax credit funds after expiration of the lease agreements. Mayflower does not dispute the *fact* that the plaintiffs did not receive a proper accounting of the amounts owing to them from the Cash Deposit Account or the *fact* that reimbursement of the tax fuel credits was owing to them. Mayflower disputes the means by which the plaintiffs seek to remedy their loss, arguing that they have not employed the correct legal means of redressing their alleged injuries and thus it is not liable for any failure to account or reimburse.

As to Case No. 0458, the owner-operators allege that they purchased insurance policies through Mayflower agents pursuant to their lease agreements. The purchases were made on a "charge-back" basis. Thus, the owner-operators paid for their policies by paying the premiums to Mayflower agents; the agents, in turn, paid premiums on behalf of the owner-operators to the insurance carriers. Moneys not actually expended on insurance premiums were owed back to the owner-operators. The owner-operators in Case No. 0458 allege that Mayflower's agents paid less for the insurance premiums than they charged the owner-operators and that the agents failed to return the difference to them. Complaint ¶¶ 28–35. Thus, to cite one example, plaintiff John E. Neidig bought occupational accident insurance through Glen Ellyn, an agent of Mayflower. Glen Ellyn charged Mr. Neidig $290.00 per month for the insurance, but paid the insurance company only $210.50 per month for the insurance. The complaint alleges that Glen Ellyn did not repay to Mr. Neidig the $79.50 per month difference as the lease agreement required. Complaint ¶ 31.

### III. *Analysis.*

#### A. The Eighth Circuit's Decision in OOI-DA v. New Prime

As previously noted, Mayflower seeks to dismiss both of these cases on three grounds: (a) plaintiffs have no private right of action; (b) the cases should be deferred to the DOT[2] pursuant to the doctrine of primary jurisdiction; and (c) Mayflower is not liable because it is not a signatory to any lease agreement with the plaintiffs.[3] The Eighth Circuit addressed

---

**2.** The Interstate Commerce Commission (ICC) was DOT's predecessor. DOT's responsibilities arise from the ICC Termination Act of 1995, which transferred the motor carrier regulatory functions of the ICC to the Department of Transportation and the Surface Transportation Board. 49 U.S.C. § 13501. Within DOT, the Federal Highway Adminis-

tration (FHWA) administers and enforces regulations that impose restrictions on lease agreements between motor carriers and owner-operators of truck tractors. These are commonly known as the "Truth–in–Leasing" regulations. *See* 49 C.F.R. Part 376.

**3.** Mayflower actually divides its arguments into two parts, not three: plaintiffs have no

the first two of these issues in fundamentally the same circumstances in *Owner–Operator Independent Drivers Association v. New Prime, Inc.*, 192 F.3d 778 (8th Cir.1999), *cert. denied, New Prime v. Owner–Operators Independent Drivers Ass'n, Inc.*, 529 U.S. 1066, 120 S.Ct. 1671, 146 L.Ed.2d 480 (2000). Although defendant is correct in stating that the Eighth Circuit's decision has no direct precedential effect on these cases, it does provide us with an extensive and carefully-reasoned analysis of the first two issues and we would be remiss in failing to pay close attention to it.

### B. *Plaintiffs' Private Right of Action.*

These cases arise under the federal truth-in-leasing regulations, 49 CFR Part 376, which govern the "lease and interchange of vehicles." [4] The statutory basis

private right of action; and FHWA has primary jurisdiction. It presents its argument that it is not liable because it is not a signatory to any lease agreement in the context of its second argument: the fact that it is not a signatory is one of the reasons why the court should defer the cases to the FHWA. We have given that argument independent focus here.

4. The regulations specifically at issue include:

49 CFR § 376.2(*l*): Escrow Fund
Money deposited by the lessor with either a third party or the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee.

49 CFR § 376.12(h)
Charge-back items. The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

49 CFR § 376.12(j)(1)
If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

49 CFR § 376.12(k): Escrow funds. If escrow funds are required, the lease shall specify:
(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.
(2) The specific items to which the escrow fund can be applied.

(3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund. The carrier shall perform this accounting in one of the following ways:
(i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or
(ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.
(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.
(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91–day, 13–week Treasury bills as established in the weekly auction by the Department of Treasury.
(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the

of these regulations is 49 U.S.C. §§ 13301 and 14102. Mayflower argues that, under the applicable statutory and regulatory regime, the plaintiffs have no private right of action, but are limited to an administrative remedy. It argues that while 49 U.S.C. § 14704(a)[5] may be invoked to support an action to enforce an agency "order," it does not provide for a direct private right of action to enforce a "regulation" as plaintiffs allege. Mayflower appears to interpret the phrase "enforce an agency order" to mean that there must be a pre-existing "order" for the court to enforce. It would follow from Mayflower's not implausible interpretation that, in order to bring an action to enforce an "order" in a federal court, the plaintiffs must first obtain an "order" from the agency. In addition to supporting its view that the plaintiffs have no private right of action, this interpretation also tends to support Mayflower's understanding that DOT (or specifically the FHWA) has primary jurisdiction over issues arising under the truth in leasing regulations.

■ While Mayflower's argument is facially plausible, it is not, finally, persuasive. First, in order to understand the context in which the issues here arise, we note that, in passing the ICC Termination Act, which substantially deregulated rail and motor carrier transportation, Congress expressly intended to reduce DOT's dispute resolution function. The House Transportation and Infrastructure Committee expressed doubt that the "DOT should allocate scarce resources to resolving these essentially private disputes, and *specifically directs that DOT should not continue the dispute resolution functions in these areas.*" "These areas" specifically included "owner-operator leasing." Accordingly, "[t]he bill provides that *private parties may bring actions in court* to enforce the provisions of the Motor Vehicle Act." H.R.Rep. No. 104-311 at 87-88 (1995), rept. in 1995-2 USCANN 793, 799-800, quoted in *New Prime,* 192 F.3d at 781 (emphasis added).

■ Second, in view of Congress's intent to reduce its dispute resolution role, the FHWA—the very agency to which Mayflower wishes to defer these cases—refused to hear OOIDA's complaint for declaratory relief in an action collateral to the *New Prime* litigation. In a Notice of June 10, 1998, 63 FR 31827, 1998 WL 298956 (F.R.), the FHWA announced that it would not issue a declaratory judgment in a statement acknowledging that, by passing the ICC Termination Act (ICC-TA), Congress "expanded the rights and remedies of persons injured by carriers by providing for *private enforcement of its provisions in court.*" Id. at 31828 (emphasis added). The Notice goes on to discuss the FHWA's interpretation of section 14704, the very provision that Mayflower interprets as providing only an administrative remedy and not a private right of action. FHWA disagreed with the position for which Mayflower now argues:

---

escrow fund be returned later than 45 days from the date of termination.

**5.** 49 U.S.C. § 14704(a) provides:
   (1) Enforcement of order.—A person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary or the Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection. A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103.
   (2) Damages for violations.—A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part.

"Under 49 U.S.C. 14704, an injured party may seek both damages and injunctive relief against a motor carrier in federal district court to redress violations of part 376." Id.

The FHWA's comments involve matters sufficiently similar to the cases here and are presented at a sufficiently broad level of generality for this court to conclude with some confidence that, faced with the same questions that are raised here, the FHWA would refuse to issue a declaratory judgment here as well. In addition, we agree with the FHWA and with the Eighth Circuit that 49 U.S.C. § 14704(a) appears *on its face* to provide for a private right of action for damages and injunctive relief by parties injured by a carrier. Accordingly, there is no need to inquire into the question of whether there is an *implied* private right of action under section 14704. As the Seventh Circuit observed in *Statland v. American Airlines, Inc.,* 998 F.2d 539, 540 (7th Cir.1993): "Implied private right of action cases arise where a statute and its legislative history say nothing about private actions to enforce its provisions." Here, the statute and the legislative history do not "say nothing." Section 14704 expressly provides for damages and injunctive relief to "a person" injured by a carrier's act or omission.

█ It is also difficult to disagree with the Eighth Circuit's conclusion that section 14704(a)(1) and (2) apply to "regulations" as well as to "orders." 192 F.3d at 784. In addition, the terms "order" and "regulation" are sometimes construed synonymously, so that, for example, a statute providing for judicial review of an agency

"order" may be construed to apply to "regulations" issued by that agency. That is how the Supreme Court interpreted 5 U.S.C. § 1034 in *United States v. Storer Broadcasting Company,* 351 U.S. 192, 196, 76 S.Ct. 763, 100 L.Ed.2d 1081 (1956). The statute provided: "Any party aggrieved by a final *order* reviewable under this chapter may, within sixty days after entry of such *order,* file in the court of appeals, wherein the venue as prescribed by section 1033 of this title lies, a petition to review such *order.*" Emphasis added. Pursuant to its regulatory function, the Federal Communications Commission issued an "order" which amended some of its regulations. Storer brought suit alleging that it was aggrieved by the regulations covered by the "order." The Court dealt with the threshold issue—whether a "regulation" is an "order" for purposes of permitting an aggrieved party to seek review—and answered affirmatively. Justice Harlan then crystallized the majority's holding in dissent by stating: "These regulations do not, in my view, constitute an 'order' within the meaning of § 1034." 351 U.S. at 207, 76 S.Ct. at 772.[6]

█ Manifestly, federal regulations that are authorized by statute and properly promulgated carry the force of law. The Seventh Circuit has observed that: "when Congress expressly delegates the authority to an agency to promulgate regulations implementing a particular statutory provision, the agency's regulations are 'entitled to more than mere deference or weight ... [they are] entitled to "legislative effect." ' " *Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir.1999), *quoting Schweiker v. Gray Panthers,* 453 U.S. 34, 44, 101

**6.** Justice Frankfurter, who also dissented, nevertheless assumed that the regulations could be construed as an "order." He wrote, in significant part, that even though he was persuaded by Justice Harlan's dissent: "I agree that the amendatory Rules promulgated by the Federal Communications Commission relating to Multiple Ownership of standard, FM and television stations constitute a reviewable 'order' within the meaning of 5 U.S.C. § 1034, 5 U.S.C.A. § 1034...." 351 U.S. at 214, 76 S.Ct. at 776.

S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). The regulations contained in 49 CFR Part 376 cannot have "legislative effect" if they are read out of the enforcement provisions of the Motor Carrier Act. As the Eighth Circuit noted: "Because section 14102 contains no mandates or prohibitions but simply authorizes the Secretary to adopt leasing requirements, it would be impossible for a carrier to violate the statute other than by violating the rules or regulations promulgated under the statute." *New Prime,* 192 F.3d at 784.

### C. *Primary Jurisdiction.*

■ As an alternative to outright dismissal pursuant to Rule 12(b)(6), Mayflower asks us either to dismiss the case because the DOT has jurisdiction over the issues or to stay proceedings pending a DOT ruling on the issues. The Seventh Circuit recently addressed the twin meanings of the doctrine of "primary jurisdiction" in *Arsberry v. State of Illinois,* 244 F.3d 558, 563–564 (7th Cir.2001). "In its central and original form" it triggers a form of "exclusive agency jurisdiction." That is, it involves an issue "that is within the exclusive original jurisdiction of the regulatory agency to resolve, although the agency's resolution of it will usually be subject to judicial review." According to the Seventh Circuit:

> When such an issue arises, the suit must stop and the issue must be referred to the agency for resolution. If the agency's resolution of the issue does not dispose of the entire case, the case can resume subject to judicial review of that resolution along whatever path governs review of the agency's decisions, whether back to the court in which the original

case is pending or, if the statute governing review of the agency's decisions designates another court, to that court.

*Arsberry,* 244 F.3d at 563.

■ Under the second definition of "primary jurisdiction," a court is permitted "to refer an issue to an agency that knows more about the issue, even if the agency hasn't been given exclusive jurisdiction to resolve it." *Arsberry,* 244 F.3d at 563. This version of "primary jurisdiction" is akin to the doctrine of abstention.[7] Id. *See McCarthy v. Madigan,* 503 U.S. 140, 144, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992); *United States v. Haun,* 124 F.3d 745, 749 (6th Cir.1997); *United States v. Osborne,* 988 F.2d 47, 49 (7th Cir.1993). Frequently such cases will concern "arcane regulatory issues[,] or cases in which the court solicits an amicus curiae brief from an interested agency[,] or cases in which the court has in effect appointed the agency to be a special master...." Id. In such cases, "the court has jurisdiction of the *case,*" where the agency in effect has jurisdiction of the *issue.* Id.

■ Mayflower does not appear to be suggesting that the DOT has "exclusive jurisdiction" to hear this matter. Instead, it invokes the second understanding of primary jurisdiction by suggesting that the issues involved here are novel and that the court should seek DOT guidance on such matters before blundering into the china closet. It points out, in addition, that the DOT is the agency vested with oversight over the statute, as a result of which it has developed expertise in analyzing matters arising under it. In sum, Mayflower argues for the agency's primary jurisdiction

**7.** The *Arsberry* court quoted the Second Circuit as follows: "the doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *National Communications Ass'n, Inc. v. AT&T Co.,* 46 F.3d 220, 222–23 (2d Cir.1995).

because the agency is better placed to handle matters arising under the statute and its regulations.

We disagree, and, instead, choose to follow the Eighth Circuit's lead in finding no reason to ask the agency for what amounts to an advisory ruling on the issues presented here. First, as we have previously noted, the agency itself has been unwilling to address similar issues. Second, the issues here involve garden-variety interpretations of statutes and regulations and equally ordinary lease contracts that require no more expertise than that usually possessed and exercised by the federal courts. Finally, as discussed earlier, we believe that the statute's remedies are more extensive than Mayflower envisions.

We note again that, in passing the ICC Termination Act, Congress expressly intended to reduce the agency's dispute resolution function. Invoking that intent, the FHWA declined to exercise its discretionary jurisdiction with respect to the very similar issues raised in *New Prime.* 192 F.3d at 785. Indeed, in declining to hear the matter, the agency observed that resolution of the claims is "fairly straightforward" and "clearly within the competence of a court to resolve." 192 F.3d at 785. As the Eight Circuit pointed out, "[w]hen the agency declines to provide guidance or commence a proceeding that might obviate the need for judicial action, 'the court [can] then proceed according to its own light.'" *New Prime,* 192 F.3d at 785–786 (internal citation omitted).

Since there is no reason to conclude that the DOT has *exclusive* jurisdiction over the claims here, since the agency has ex-

pressed reluctance to resolve such issues, and since the agency has indicated that such matters are "fairly straightforward" and thus do not require the kind of expertise that Mayflower believes the agency uniquely possesses, we deny Mayflower's alternative request that these proceedings either be dismissed or stayed pending resolution by the DOT.

### D. *Mayflower's Potential Liability.*

In addition to the questions of whether plaintiffs have a private right of action under the regulations and whether this court should defer resolution to the DOT, Mayflower also raises the question of whether it may be held liable for alleged misconduct under leases to which it was not a signatory. There are two principal reasons for denying Mayflower's motion to dismiss on this final ground.

First, Mayflower's motion as to this theory of dismissal is based, in significant part, on factual statements that cannot be resolved on a Rule 12(b)(6) motion. *International Marketing, Ltd. v. Archer–Daniels–Midland Company, Inc.,* 192 F.3d 724, 729 (7th Cir.1999) ("it is a truism that fact-finding has no part in resolving a Rule 12(b)(6) motion. . . .") For example, Mayflower asserts, without any other support, that: it never exerted possession or control over the funds that are at issue here; it neither approved nor disapproved any of the escrow and refund arrangements and has no records of them; and, since the escrow arrangements "may vary from agency to agency, the accounts will contain sums generated from sources that do not involve any Mayflower activity".[8] May-

8. Meanwhile, plaintiffs alleged, for example, that: "Mayflower required each Owner–Operator to . . . furnish Mayflower with a security deposit for the purpose of covering amounts advanced or obligations incurred by Mayflower on behalf of the Owner–Operators. Such security deposits were to be held in escrow and maintained by Mayflower. . . ." Complaint ¶ 33. And: "Mayflower maintains fuel-tax credit accounts for each Owner–Operator." Complaint ¶ 34. We are, of course,

flower's argument also relies on unsupported factual assertions concerning the relationship between Mayflower and its agents. Def. Memo. to Dismiss, pp. 17–18.

■ These statements do not raise matters of law—such as whether the agreements at issue here are "leases" pursuant to 49 CFR § 376.2(e) or whether the accounts are "escrow" accounts pursuant to § 376.2(*l*) and 376.12(e)—which are uniquely susceptible of adjudication on a motion to dismiss. Instead, they are statements of fact which require evidentiary support, as on a motion for summary judgment. Since Mayflower did not offer admissible evidence outside the pleadings, there is no basis for considering such factual recitations. *See, e.g., Ribando v. United Airlines, Inc.*, 200 F.3d 507, 509 (7th Cir.1999).

Second, as to the uniquely legal issues, plaintiffs make a strong argument that Mayflower may be liable under the governing regulations. The basis for such liability is 49 CFR § 376.12(m), which provides:

> This paragraph applies to owners who are not agents but whose equipment is used by an agent of an authorized carrier. In this situation, the authorized carrier is obligated to ensure that these owners receive all the rights and benefits due an owner under the leasing regulations, especially those set forth in paragraphs (d)-(k) of this section. This is true regardless of whether the lease for the equipment is directly between the authorized carrier and its agent rather than directly between the authorized carrier and each of these owners. The lease between an authorized carrier and its agent shall specify this obligation.

■ It is uncontested here that Mayflower had agency relationships with the business entities with which the plaintiffs had leases. Indeed, Mayflower admits that plaintiffs had agreements with "Mayflower agents," whose relationships with Mayflower were established by agency agreements. Since Mayflower was obligated to ensure that the owners' rights were protected "regardless of whether the lease for the equipment is directly between the authorized carrier and its agent rather than directly between the authorized carrier and each of these owners," Mayflower's potential liability appears to be established by operation of law. Accordingly, the question of whether it signed any agreement with the owner-operators is irrelevant to a finding of potential liability, so that even if it entered into no leases directly with the plaintiffs, it may be liable under an appropriate set of facts. That is all plaintiffs need show on a Rule 12(b)(6) motion.

■ Finally, Mayflower may be liable for the acts of its agents under the federal common law of agency, at least for purposes of a Rule 12(b)(6) motion. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir.2000); *Anderson v. International Union, United Plant Guard Workers of America*, 150 F.3d 590, 593 (6th Cir.1998). In other words, there is a conceivable set of facts under which Mayflower could be liable even if it did not sign any lease agreement: the set of facts which includes the fact that Mayflower's agents were authorized (actually or apparently) to engage in lease agreements with the plaintiffs and to bind Mayflower by its agreements. Accordingly, dismissal is inappropriate on that ground as well. *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 854 (7th Cir.1999) ("[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate.")

obliged to accept plaintiffs' well-pleaded allegations on a motion to dismiss.

### E. *Plaintiffs' State Law Claims.*

Mayflower asks us not to exercise supplemental jurisdiction over the owner-operators' state law claims in the event we grant its motion to dismiss their federal claims.[9] Since we have denied Mayflower's motion to dismiss the federal claims, and since there is no apparent basis for refusing to exercise our supplemental jurisdiction, we deny Mayflower's request to dismiss plaintiffs' state law claims.

### IV. Conclusion.

For the foregoing reasons, Mayflower's motion to dismiss all claims pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED.

It is so ORDERED this 23rd day of August 2001.

---

**9.** 28 U.S.C. § 1367(c) provides: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
  (1) the claim raises a novel or complex issue of State law,
  (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or
  (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."