OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, Wood–Chuck Leasing, Inc., Mark Dudgeon, and John E. Neidig, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

MAYFLOWER TRANSIT, INC., Defendant.

Nos. IP 98–0457–C B/S, IP 98–0458–C B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 5, 2001.

James A. Calderwood, Zuckert Scoutt & Rasenberger, Washington, DC, David C. Campbell, Bingham Summers Welsh & Spilman, Indianapolis, IN, David Wells, Thompson Coburn LLP, St. Louis, MO, for Defendant.

## ENTRY ON PLAINTIFFS' MOTIONS TO CERTIFY CLASSES

BARKER, District Judge.

### I. *Introduction.*

This Entry concerns two class actions, each consisting of approximately 1,000 plaintiffs. The plaintiffs are owner-operators of truck tractors who contract with Mayflower or Mayflower's agents to haul goods nationwide.[1] The cases are before us on plaintiffs' motions to certify the respective classes.[2] Notwithstanding the presence in Case No. 0457 of two representative plaintiffs not named in Case No. 0458, the issues on certification are sufficiently similar to warrant discussion together.

The plaintiffs in Case No. 0457 allege that Mayflower has breached federal Truth in Leasing regulations by failing to return "cash deposits" and/or fuel-tax moneys maintained in federally-regulated escrow accounts within 45 days after Mayflower's lease contracts with the owner-operators terminated. They seek to certify a class consisting of all independent truck owner-operators who entered into regulated leases with Mayflower, directly or indirectly through Mayflower's agents, and who have each paid money into an escrow or "cash deposit" account held by Mayflower or its agents, and/or have had state fuel-tax credits withheld by Mayflower or its agents.

The plaintiffs in Case No. 0458 allege that Mayflower has breached the same federal Truth in Leasing regulations by overcharging owner-operators for insurance products purchased by owner-operators through May-

David J. Carr, Ice Miller, Indianapolis, IN, Paul D. Cullen, Sr., Cullen & O'Connell, Washington, DC, for Plaintiffs.

1. The two cases have been consolidated for purposes of discovery and were consolidated for the purpose of addressing Mayflower's motion to dismiss. *OOIDA et al v. Mayflower,* 161 F.Supp.2d 948 (S.D.Ind.2001).

2. The cases contain overlapping members. As we noted in our decision on Mayflower's motion to dismiss, two of the four class representatives in Case No. 0457 are also representatives in Case No. 0458. This case appears to be amenable to a single class action with two sub-classes, an issue we will take up in future proceedings.

flower or its agents. The plaintiffs allege that Mayflower properly deducted amounts from owner-operators' compensation, but acted unlawfully in deducting more than the insurance products actually cost. They seek to certify a class consisting of all independent truck owner-operators who entered into federally regulated leases either directly with Mayflower or indirectly through Mayflower agents, and for whom either Mayflower or its agent obtained insurance policies and charged back monies for those policies to the owner-operators.

For the reasons that follow, we GRANT plaintiffs' motions to certify both classes, subject to the conditions addressed below.

## II. *Nature of the Case.*

### A. *The Parties.*

The Owner–Operators Independent Drivers Association (OOIDA), a class representative in both Case No. 0457 and Case No. 0458, is a non-profit association of individuals who own or control truck tractors and who haul property on the nation's highways. The owner-operators act as independent contractors who lease their equipment and services to motor carriers authorized by the Department of Transportation (DOT) to contract with shippers for the transport of property. Mayflower is such an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a). Mayflower provides transportation services to consumers under DOT's governing authority.

OOIDA also represents owner-operators in judicial and legislative forums. Its membership consists of some 40,000 owner-operators who operate some 66,000 trucks throughout the United States and Canada. OOIDA has lobbied on behalf of owner-operators for legislation involving the regulation of leases and private rights of action for owner-operators against carriers. Johnston Aff. ¶ 2.[3]

The individual class members are owner-operators who have entered into regulated leases with Mayflower or with Mayflower authorized agents. John Neidig, a proposed representative in both Case No. 0457 and Case No. 0458, was an owner-operator who held lease contracts with Glen Ellyn Moving and Storage and Gazda Moving and Storage, both agents of Mayflower's. Neidig Dep., 11–12, 15–16, 19. Deductions were made from Mr. Neidig's compensation and held in accounts for the payment of fuel taxes and for other expenses. Neidig Dep., pp. 27–30. Mr. Neidig also complains that he purchased insurance products through Mayflower agents and was overcharged for those products. Neidig Dep., pp. 29–30, 41–42, 61–71.

Marc Dudgeon is an owner-operator. He owns his own trucking company and has entered into lease agreements with Mayflower agents. Dudgeon Dep., pp. 6–7, 16–17. Deductions were made from his compensation for fuel taxes and for other expenses. Dudgeon Dep., pp. 28–29, 52–53. Wood–Chuck Leasing is a trucking company that leases trucks and drivers to regulated carriers. Its president is Worthy Chambers. Chambers Dep., 8, 11, 15. Mr Chambers is Wood–Chuck's only driver and Wood–Chuck owns only one truck. Chambers Dep., p. 15. Wood–Chuck had lease contracts with Glen Ellyn Moving and Storage. Chambers Dep., p. 16. Glen Ellyn made deductions from Wood–Chuck's compensation for expenses, but not for fuel taxes. Chambers Dep., 38–40.

### B. *The Regulated Lease Agreements.*

Owner-operators such as the plaintiffs and carriers such as Mayflower enter into written lease agreements which are governed by federal statute, 49 U.S.C. §§ 14102 et seq., and regulations, 49 C.F.R. Part 376. Sometimes, owner-operators enter into lease agreements not directly with the carrier, but with the carrier's authorized agent. As an authorized motor carrier, Mayflower is required by federal law to assume responsibility for its agents' actions with respect to the services provided by the agents on Mayflower's behalf.[4] *See OOIDA v. Mayflower*, 161 F.Supp.2d 948, 958–59.

**3.** James L. Johnston is president of OOIDA. He filed an affidavit in support of plaintiffs' motions to certify the classes.

**4.** 49 CFR § 376.12(m) provides:
This paragraph applies to owners who are not agents but whose equipment is used by an agent of an authorized carrier. In this situa-

The lease agreements governing the relationship between carriers and owner-operators are comprehensive and detailed. As to Case No. 0457, all of the lease agreements into which the plaintiffs have entered with Mayflower's agents include provision for "cash accounts" and for fuel-tax credit accounts, which are "escrow funds" pursuant to 49 CFR §§ 376.2(l)[5] and 376.12(k).[6] During the term of their leases with Mayflower or its agents, portions of the owner-operators' compensation—in practice varying between $1,000 and $2,500—are deducted and maintained in "cash deposit accounts"; the money in these accounts is used for a variety of purposes, including to repay advances, to cover repairs, licenses, state permit costs, and the like. Such cash deposit accounts are maintained by Mayflower or its agents pursuant to federal regulations.

In addition, owner-operators' compensation is also deducted and placed in fuel-tax credit accounts. The purpose of those accounts is to distribute to the respective states the amounts that each owner-operator owes in fuel taxes to each state in which his truck consumes fuel. Each state imposes a fuel tax based on the amount of fuel that tractor trailers *consume* in the state and not on fuel *purchased* within the state's borders. Thus, in practice, a driver traveling from east to west may purchase fuel in Indiana, travel through Illinois without purchasing fuel, and then refuel in Iowa. If fuel taxes were based on the state of *purchase,* Illinois will have received no tax, even though the driver will have *consumed* considerable fuel in passing through it. Moreover, just as the driver has "underpaid" taxes in Illinois, he has "overpaid" in Indiana and in Iowa, the states in which he has actually purchased fuel.

The fuel tax credit is a means of adjusting the payment of taxes to the respective states on a fleet-wide basis by having the carrier accrue and distribute the taxes to all of the interested states fleet wide. Pursuant to the lease agreements, the owner-operators are

tion, the authorized carrier is obligated to ensure that these owners receive all the rights and benefits due an owner under the leasing regulations, especially those set forth in paragraphs (d)-(k) of this section. This is true regardless of whether the lease for the equipment is directly between the authorized carrier and its agent rather than directly between the authorized carrier and each of these owners. The lease between an authorized carrier and its agent shall specify this obligation.

5. 49 CFR § 376.2(l) defines an "Escrow Fund" as follows: "Money deposited by the lessor with either a third party or the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee."

6. 49 CFR § 376.12(k) further provides that, if escrow funds are required, the lease shall specify:

(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.

(2) The specific items to which the escrow fund can be applied.

(3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund. The carrier shall perform this accounting in one of the following ways:

(i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or

(ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91-day, 13-week Treasury bills as established in the weekly auction by the Department of Treasury.

(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

entitled to a monthly accounting of the over- and under-payments. The owner-operators are also entitled to a refund of the unexpended portion of the fuel tax credits within forty-five days after the lease expires. 49 CFR § 376.12(k)(6).

At the heart of Case No. 0457, the owner-operators allege that they did not receive the moneys collected in the cash deposit accounts and/or in the fuel tax credit funds within forty-five days after expiration of the lease agreements. Indeed, they allege that Mayflower has kept these monies for more than three years after expiration. They also allege that Mayflower's *method of applying* the fuel-tax credits is unlawful. They allege that Mayflower carries over tax credits in the aggregate, month-to-month, but pays them only when they are due in a particular state. Thus, if an owner-operator had a tax *credit* in Indiana, Mayflower would carry it over until that owner-operator owed a tax in Indiana; it would then apply that amount to its tax obligation in Indiana. But it would never apply the credit to the owner-operator's tax debt in a state other than Indiana and it would never simply return the credit to the owner-operator. Plaintiffs allege that, in this way, Mayflower has had the unlawful use of large sums of money for extended periods of time, where those sums should have been used either to pay down the owner-operators' tax debts in other states or returned to the owner-operators. The plaintiffs allege that this conduct violated both truth in leasing regulations and Indiana's law of conversion.

In Case No. 0458, the owner-operators allege that they purchased insurance policies through Mayflower agents pursuant to their lease agreements. Mayflower estimates that 90% of contract truckmen and van operators buy bobtail, physical damage, or workers compensation insurance through corporate entities related to Mayflower and that 20%

purchase medical, dental, life, and disability insurance. The purchase of those policies is made on a "charge-back" basis.[7] Thus, the owner-operators paid for their policies by paying the premiums to Mayflower agents; the agents, in turn, paid premiums on behalf of the owner-operators to the insurance carriers. Moneys not actually expended on insurance premiums were owed back to the owner-operators.

The owner-operators in Case No. 0458 allege that Mayflower's agents paid less for the insurance premiums than they charged the owner-operators and that the agents failed to return the difference to them. Thus, to cite the example of the named plaintiff, John E. Neidig bought occupational accident insurance through Glen Ellyn, an agent of Mayflower. Glen Ellyn allegedly charged Mr. Neidig $290.00 per month in insurance premiums, but paid the insurance company only $210.50 per month in premiums. The complaint alleges that Glen Ellyn did not repay to Mr. Neidig the $79.50 per month difference as the lease agreement required. The plaintiffs argue that the amount they were overcharged averages between $79.00 and $100.00 per month during the leases.

The plaintiffs in both cases seek to certify a class for the purposes of declaring their rights pursuant to federal law, enjoining Mayflower from engaging in its allegedly unlawful conduct, recovering the moneys withheld, with interest, and damages. Plaintiffs in Case No. 0457 also expressly allege a count of conversion under Indiana law and seek damages pursuant to it as well.

### III. *Analysis.*

#### A. *Class Certification.*

■ The decision to certify a class resides in the court's sound discretion. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998). Plaintiffs in both cases seek to certify their respective classes under Fed.R.Civ.P. 23(a)

---

**7.** 49 C.F.R. § 376.12(h) governs charge-back items and provides: "The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each items is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge."

In addition, 49 C.F.R. § 376.12(j)(1) regarding insurance provides: "If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor."

and under Rule 23(b)(3). Mayflower opposes class certification on several grounds, the most important of which are the three following: first, the class is poorly defined so that any decision as to whether the class should be certified requires us to resolve the merits of the underlying dispute; second, the class representatives are inadequate because their interests are different from those of the class members and because their claims are not typical of the class; and third, a class action is precluded because particular questions of law and fact involving the individual plaintiffs tend to predominate over the issues of law and fact that are common to all.

### 1. *Definition of the Classes.*

■ The plaintiffs in Case No. 0457 seek to certify a class consisting of:

all independent truck owner-operators ("Owner–Operators") who entered into regulated leases with Mayflower, directly or indirectly through Mayflower's agents, and who have each paid money into an escrow or "cash deposit" account held by Mayflower or its agents, and/or have had state fuel-tax credits withheld by Mayflower or its agents.

■ The plaintiffs in Case No. 0458 seek to certify a class consisting of:

all independent truck owner-operators who entered into federally regulated leases either directly with Mayflower or indirectly through Mayflower agents, and for whom either Mayflower or its agent purchased or obtained insurance policies and charged back monies for those policies to the owner-operators.

Mayflower has questioned the definitions of both classes, arguing that they lack definiteness and that, as a result, we must resolve the merits of the individual cases before we can determine whether the class may be certified—an obviously self-defeating enterprise if we were to engage in it. It is true that an early class definition in Case No. 0457 included words to the effect that the class members "were entitled" to the moneys collected and maintained by Mayflower or its agents in cash deposit or fuel-tax accounts. Mayflower construed this language to mean that the court would have to resolve the underlying issue—whether the class members were actually entitled to the moneys—before the issue of class certification could be determined.

Although the earlier rendition may have been subject to such construction, the definitions of the classes as they appear after briefing eliminate the potential confusion. As the Supreme Court has noted, we may sometimes need to "adjust the class, informed by the proceedings as they unfold." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). We believe that has been successfully accomplished here and that the classes are now sufficiently definite and consistent with plaintiffs' complaint allegations to proceed. We note this problem here because several of Mayflower's objections to class certification, addressed below, rest on the same misconstruction: that, given the plaintiffs' definition of the classes, the merits have to be resolved before the issue of class certification can be. When we eliminate the confusion between issues going to the merits of the claims and issues going to the question of whether the classes should be certified, the question of class certification is readily resolved in favor of certification.

Nevertheless, although we do not believe that Mayflower's objections are sufficient to deny class certification, we take them as cautions against over-inclusive definitions of the class and hold that the classes must be conditioned on two features raised by Mayflower. First, both classes must be limited to owner-operators who had moneys deducted for the purposes described in the definitions above and who make a good faith allegation that Mayflower unlawfully failed to rebate moneys owed to them in a timely fashion after their leases expired. This condition is designed to bar class membership to owner-operators who may think (even correctly) that Mayflower owed them moneys for reasons other than the unlawful conduct in which Mayflower is alleged to have engaged.

Second, Mayflower suggested in its opposition to certification and in its supplemental opposition that some claims may be time

barred by some contract or tort statute of limitations. Although that issue is not before us and the parties have not addressed it in any detail, we note that both classes will be limited to members who assert timely actions. We therefore call upon the parties to agree—preferably—on a date certain for members' inclusion in both classes, or, alternatively, to inform us of the statutes of limitations issues with respect to the governing federal regulations (if any), and/or state contract statutes of limitations, and/or state tort statutes of limitations. Thus we make this certification conditional, as we may pursuant to Fed.R.Civ.P. 23(c)(1). *See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, n. 11, 98 S.Ct. 2454, 2458, n. 11, 57 L.Ed.2d 351, (1978) (Because of Rule 23(c)(1), "a district court's order denying or granting class status is inherently tentative"); *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977).

2. *Class Certification Criteria:* We next proceed to the four criteria of class certification identified in Rule 23(a):

■ a. *Numerosity.* The Rules require that the class be so large that joinder of all parties would be impracticable. In both cases here, the numerosity requirement is obviously satisfied. Initial document production indicates that the classes will consist of at least 1,000 similarly-situated owner-operators who are geographically dispersed throughout the nation. Joinder would be little short of impossible. In *Hubler Chevrolet v. General Motors Corp.,* 193 F.R.D. 574, 577 (S.D.Ind.2000), by contrast, we certified a class numbering 200. In *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 184 (N.D.Ill.1992), the court approved a potential class consisting of 129–300 members where they were geographically dispersed.

Mayflower questions whether the plaintiffs have established even an approximate number of potential plaintiffs and argue that speculation as to the size of the classes cannot substitute for reasonable specificity.

While it is correct in observing that we cannot found a class on purely speculative numbers, its argument rests on the erroneous proposition that we must resolve the question of *who is* owed money—that is, whether the claims are meritorious—before resolving the question of whether the proposed class—that is *who may* be owed money—meets the numerosity requirement.

■ b. *Commonality.* To qualify as a class action, there must be questions of law or fact common to the members of the class. The commonality requirement is ordinarily satisfied when there is "a common nucleus of operative facts." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). As we noted in *Hubler,* 193 F.R.D. at 577:

Commonality does not require that all questions of fact or law be identical. *See Johns v. DeLeonardis,* 145 F.R.D. 480, 483 (N.D.Ill.1992). Factual variation among class grievances does not defeat a finding of commonality. *See Rosario,* 963 F.2d at 1017. Rather, this requirement is satisfied as long as "the class claims arise out of the same legal or remedial theory," *Johns,* 145 F.R.D. at 483. It is enough to satisfy commonality that there be a "common question ... at the heart of the case...." *Rosario,* 963 F.2d at 1018.

The commonality requirement may be satisfied where there is a single overriding issue of law or fact common to all. *In re Prudential Ins. Co. of Amer. Sales Practices Litigation,* 148 F.3d 283, 310 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

■ Here, there are common issues of law *and* fact in both cases. First, the relevant provisions of the leases at issue in both cases are all but identical and all of them are governed by the same federal regulations. The common legal issues in both cases include: whether the accounts maintained by Mayflower or its agents are "escrow accounts" for purposes of federal regulations;[8] whether Mayflower is liable under federal regulations for the actions of its agents;[9]

---

8. We answered this question in the affirmative in *OOIDA v. Mayflower,* 161 F.Supp. 2d at 957–59 on Mayflower's motion to dismiss.

9. We also answered this question in the affirmative in *OOIDA v. Mayflower,* 161 F.Supp.2d at 958–59.

whether Mayflower (either directly or through its agents) violated the terms of its leases with the owner-operators by failing to timely return moneys held in cash accounts, and/or by failing either to apply fuel-tax credits from any state to owner-operators' fuel debts in other states or by timely returning the moneys to them, and/or by charging owner-operators more in insurance premiums than the owner-operators actually owed. All of the claims in Case No. 0457 also involve the question of whether Mayflower's action violates Indiana's law of conversion.

These common issues of law are all rooted in common issues of fact, including: all class members have entered into lease agreements with Mayflower or its agents; all class members in Case No. 0457 have had moneys deducted from their compensation and maintained in escrow accounts for the purpose of repaying advances against various expenses and all have had moneys deducted from their compensation and maintained in fuel-tax accounts. Similarly, all class members in Case No. 0458 have purchased insurance on a charge-back basis through Mayflower or its agents. Such purchases are governed by federal lease regulations. The plaintiffs in Case No. 0458 allege that Mayflower engaged in a pattern of conduct—overcharging for insurance—with respect to all of them. Mayflower's alleged misconduct affects all owner-operators in each of the two cases in the same manner, if not to the same degree.

Mayflower does not challenge the proposition that common issues of law and fact are present in both cases. Its principal argument is that those common issues do not *predominate;* instead, it argues, *particular* issues of law and fact predominate and these are susceptible to resolution through individual lawsuits.

Thus, Mayflower argues in Case No. 0457 that the leases vary significantly. Some contain handwritten modifications which others do not. They also vary as to their provisions for: buying and leasing equipment from the company; workers compensation; maintenance expenses; Mayflower's liability for bodily injury and property damage; insurance coverage; licenses; charge backs; and settlement of the contractors' statement accounts. Mayflower argues that these differences are magnified by the fact that the leases are contracts that were executed in different jurisdictions and substantive contract law varies by jurisdiction.

These differences strike us as either irrelevant or collateral to the issue of class certification. Many of the provisions that Mayflower refers to are simply not at issue in this lawsuit. As to the ones that are, the common question of law is whether Mayflower's conduct with respect to those lease provisions violates *federal* regulations. It should go without saying that federal truth-in-leasing regulations have the force of law, *see Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir.1999), and trump state contract law by virtue of the Supremacy clause. Const. § VI. Mayflower is free to address the merits of plaintiffs' claims in a later proceeding. Its objections are insufficiently weighty to deny class certification.

■■■ c. *Typicality:* The "typicality" requirement is similar to the commonality standard. Typicality is satisfied where the named plaintiffs' claims "arise[ ] from the same ... practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). As the Third Circuit has observed: "The typicality requirement is designed to align the interests of the class and class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Prudential,* 148 F.3d at 311. "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.*

■■■ Here, the named plaintiffs in both cases share with all class members in their respective classes: (1) the same factual allegations as to Mayflower's wrong doing; (2) the same legal claims that Mayflower's conduct violates federal statutes and regulations as well as state contract law (and in Case No.

0457, Indiana's law of conversion) and the common remedies of declaratory and injunctive relief and damages; and (3) the same interest in proving Mayflower's liability.

We agree with the plaintiffs that the question of whether some of them may owe money to Mayflower and the related question of whether Mayflower may have counterclaims against some of them do not preclude a finding that the class representatives' claims are typical of the class members' claims. Several courts have addressed problems that may arise when a defendant asserts a counterclaim in a class action. Suffice to say at this early stage in the proceedings that this court may consider the potential for a counterclaim and still find the typicality requirement satisfied for class certification purposes. *See, e.g., Channell v. Citicorp National Services, Inc.,* 89 F.3d 379 (7th Cir.1996); *also see, Davis v. Cash for Payday, Inc.,* 193 F.R.D. 518, 521–522 (N.D.Ill.2000).

d. *Adequacy of representation:* The named representatives must be able to fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). The Supreme Court has noted that the "adequacy" requirement tends to merge with the "commonality" and "typicality" requirements, because the more common and typical the class's interests are, the less likely it will be for conflicts to arise between the class representative and other members. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626, n. 20, 117 S.Ct. 2231, 2251, n. 20, 138 L.Ed.2d 689 (1997).

The adequacy standard involves two elements: one relates to the adequacy of the named plaintiffs' representation of the class and requires that there be no conflict between the interests of the representatives and those of the class in general; the other relates to the adequacy of class counsel's representation. See 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil* §§ 1765, 1766, 1769.1. Both are satisfied here.

██ As to the adequacy of the named representative, we stated in *Hubler Chevrolet:*

The interests of the class members need not be identical; the only conflicts relevant to our inquiry are those that relate materially to Plaintiffs' claims. In addition, as will be addressed in our discussion of (b)(3) certification, if members of the putative class believe that the named plaintiffs do not adequately represent their interests, they may choose to opt out of the suit. 193 F.R.D. at 578. As the owner-operators' association which has undertaken both legal and legislative efforts for the owner-operators, OOIDA has a powerful interest in defending the owner-operators' contract rights. It has proven itself to be an adequate representative in the past. See Paul D. Cullen Aff. ¶ 4, n. 1.

Mayflower contends that OOIDA has suffered no injury and has no real stake in the outcome. Accordingly, it argues, even if OOIDA has standing to serve as a class representative (which it questions), it is not an adequate representative. We disagree. It is well settled that an association may serve as the class representative of its members under circumstances such as those that prevail here. *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 281, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986). *See Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 600 (7th Cir.1993).

Mayflower does not challenge the representation of Messrs. Neidig and Dudgeon in Case No. 0457, although it questions whether Wood–Chuck leasing is an adequate representative since it is a leasing company rather than an individual owner-operator. Wood–Chuck's sole driver is its president Worthy Chambers, and we see no basis for doubting that Mr. Chambers shares common interests with the individual owner-operators.

As to the second factor, Mayflower does not challenge class counsel's experience and expertise. Lead counsel in both cases, Paul D. Cullen, lists numerous class litigations in which he and his firm have engaged, including several involving the trucking industry; in several of those cases OOIDA has been its client. Cullen Aff., ¶¶ 3, 4. He also represents to the court that local counsel (formerly

with the Johnson Smith law firm) are well qualified and experienced and these representations are unchallenged.

For these reasons, we find that the plaintiffs have satisfied the four class certification requirements of Rule 23(a).

### 3. *Rule 23(b)(3) Requirements.*

 In addition to satisfying the criteria of Rule 23(a), the plaintiffs argue that their actions satisfy the standards of both Rules 23(b)(2) and (3), although they focus on Rule 23(b)(3) criteria. Since the complaints in both cases seek declaratory and injunctive relief, we address the Rule 23(b)(2) issue as well. To satisfy Rule 23(b)(2), the plaintiffs must show that Mayflower "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." We believe that plaintiffs have established the requirements of certification under 23(b)(2) in both cases by showing that Mayflower's common course of conduct affected the class members in each class universally. In other words, all class members in both cases were affected by Mayflower's common course of dealing, varying only to the extent that the amounts not returned to them (if any) or the amounts overcharged for insurance (if any) varies.

To satisfy Rule 23(b)(3), plaintiffs must show that "the questions of law and fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The language suggests a showing on two factors: that "the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members"; and that "a class action is *superior* to other available methods

for the fair and efficient adjudication of the controversy."

a. Common questions predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil* § 1788. *See Amchem,* 521 U.S. at 615–616, 117 S.Ct. at 2246. As we noted in *Hubler Chevrolet,* the predominance requirement is satisfied when there is an "essential factual link between all class members." 193 F.R.D. at 580. The Supreme Court has cautioned us to weigh the predominance and superiority issues against individual class member's interest in going it alone. *Amchem,* 521 U.S. at 616, 117 S.Ct. at 2246.

 For reasons addressed earlier in this entry, the situation in this case permits us to conclude that common issues of law and fact predominate over individual issues. All of the issues in both cases arise from a common nucleus of operative facts: Mayflower's alleged course of conduct in failing to return moneys which, plaintiffs allege, it had a legal obligation to repay to the owner-operators: in Case No. 0457, moneys held in cash accounts and fuel-tax credit accounts; in Case No. 0458, moneys deducted but not expended for insurance premiums. Notwithstanding Mayflower's argument that the contract law of several states is at issue—which focuses on cases involving the application of state law to nationwide class actions in federal courts—we find that the paramount issues involve the interpretation and application of federal truth-in-leasing regulations.[10] By contrast, the individual differences to which Mayflower points—variations in lease provisions and variations in how Mayflower or its agents treated particular contractors under certain circumstances—are insufficient to outweigh the common issues. It follows that class issues predominate.[11]

---

10. We reserve judgment about the applicability of Indiana's law of conversion in Case No. 0457, an issue which the parties have addressed only cursorily. On the current record, we cannot determine as a matter of law whether plaintiffs state a viable cause of action for conversion.

That issue is not squarely before us and a determination of it is not required to certify the class.

11. As we noted in *Uhl v. Thoroughbred Technology and Telecommunications, Inc.,* 2001 WL 987840, *9, n. 7 (S.D.Ind. August 28, 2001), the predominance problems raised in *Amchem,* a

b. Additionally, we find that a class action in these matters is the superior method of adjudication. Both classes include 1,000 or more members. The amounts at issue in Case No. 0457 range between $1,000 and $2,500; in Case No. 0458 between $79.00 and $100.00 per month during the leases. A lawsuit by each individual plaintiff is impracticable since the amount of money at issue is less, in many cases, than the amount it would cost for each to prosecute a case. We note in addition that the individual owner-operators suffer an additional disadvantage that most individual litigants do not: because they travel an average of 100,000 miles per year, they are absent on the average 300 nights per year. Johnston Aff., ¶ 4. Accordingly, even if they were inclined to prosecute their cases, it is unlikely that they could marshal the time to do so. It follows that, absent a class action, the individuals would likely be without a remedy and Mayflower would likely retain the benefits of its alleged wrongdoing. As the Supreme Court has observed: "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they employ the class-action device." *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). *See Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748, 760 (7th Cir.2000).

For these reasons, the class satisfies the criteria for certification under Rule 23(b)(3).

## IV. *Conclusion.*

We find that the plaintiffs have satisfied all of the pertinent standards for class certification. Accordingly, we ORDER CERTIFIED the following two classes, subject to the additional language contained in the following definitions and to the conditions noted below:

In Case No. 0457: a class consisting of

all independent truck owner-operators ("Owner–Operators") who entered into regulated leases with Mayflower, directly or indirectly through Mayflower's agents, and who have each paid money into an escrow or "cash deposit" account held by Mayflower or its agents, and/or have had state fuel-tax credits withheld by Mayflower or its agents, and who in good faith may assert that Mayflower unlawfully refused to rebate the moneys deducted from their compensation.

In Case No. 0458, a class consisting of:

all independent truck Owner–Operators who entered into federally regulated leases either directly with Mayflower or indirectly through Mayflower agents, and for whom either Mayflower or its agent purchased or obtained insurance policies and charged back monies for those policies to the owner-operators, and who in good faith may assert that Mayflower unlawfully overcharged them for insurance or unlawfully failed to repay them moneys that were overcharged for insurance.

In addition to the language we have added to the class definitions as a means of limiting class membership, we also condition class membership on compliance with the applicable statutes of limitations. Accordingly, we encourage the parties to agree, if possible, on the appropriate statutes of limitations for class membership in both classes. If the parties are unable to agree, we ORDER the parties to inform us of the statutes of limitations that apply to the two classes, including, but not necessarily limited to, any federal statute of limitations that may apply to the truth-in-leasing regulations, and any state contract and/or tort (specifically conversion) statute that may apply. If the parties submit briefs, both parties' briefs will be filed

---

nationwide class action involving injuries from asbestos, serve as an object lesson in over-inclusiveness. The "common facts" there were so broadly defined that potentially millions of people, many unidentifiable, with enormously different interests were included in the class. The individual issues that remained after the "common facts" were defined turned out to be the crucial ones: exposure to "different asbestos-containing products, for different amounts of time, in different ways, and over different periods," with differing manifestations of injury, or none at all-overwhelmed these common facts. 521 U.S. at 623–624, 117 S.Ct. at 2250. In other words, common facts did not predominate.

and served on or before 30 days after the entry of this Order; any reply briefs will be filed and served within 45 days after the entry of this Order.

To avoid any doubt as to this matter, we will not approve any Notice to the putative class members unless it incorporates the applicable statute(s) of limitations or an agreed upon stipulation by the parties.