**OWNER–OPERATOR INDEPENDENT DRIVERS ASSOCIATION, et al.,**
Plaintiff,

v.

**MAYFLOWER TRANSIT,
INC., Defendant.**

IP 98–0457–C B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 8, 2002.

See, also, 204 FRD 138.

David J. Carr, Indianapolis, IN, Paul D. Cullen Sr, The Cullen Law Firm PLLC, Washington, DC, for Plaintiff.

James A. Calderwood, Zuckert Scoutt & Rasenberger, Washington, DC, David C. Campbell, Bingham McHale LLP, Indianapolis, IN, David Wells, Thompson Coburn LLP, St. Louis, MO, for Defendant.

## ENTRY ON PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT ON FUEL TAX CREDITS

BARKER, District Judge.

### I. *Introduction.*

This case is before the court on plaintiffs' motion for partial summary judgment on the question of whether defendant Mayflower has unlawfully retained fuel tax credits in violation of federal Truth in Leasing Regulations and of Indiana conversion law. The present motion arises against the backdrop of two previous rulings, one denying Mayflower's motion to dismiss, and the other certifying the class of owner-operators for purposes of this litigation.[1] For the reasons discussed be-

---

1. We denied Mayflower's motion to dismiss in an entry published August 23, 2001. *Owner–Operator Independent Drivers Association v. Mayflower Transit, Inc.,* 161 F.Supp.2d 948 (S.D.Ind.2001). In our published entry of November 5, 2001, we certified two classes: one in this case, Case No. IP98–0457, and the second in a parallel litigation, Case No., 98–0458. *Owner–Operator Independent Drivers Association v. Mayflower Transit, Inc.,* 204 F.R.D. 138 (S.D.Ind.2001). The class in this case as defined in our certification order is: "a class consisting of all independent truck owner-operators ("Owner–Operators") who entered into regulated leases with Mayflower, directly or indirectly through Mayflower's agents, and who have each paid money into an escrow or 'cash deposit' account held by Mayflower or its agents, and/or have had state fuel-tax credits withheld by Mayflower or its agents, and who in good faith may assert that

low, we GRANT plaintiffs' motion for summary judgment with respect to its claim that Mayflower's conduct violates the federal Truth in Lending Regulations, but DENY the motion with respect to its claim that Mayflower's conduct violates Indiana conversion law.

## II. *Statement of Facts*

The following facts are uncontested. Although Mayflower denied almost all of the owner-operators' statements of fact, it did not contest them pursuant to Local Rule 56.1 by pointing to evidence supporting a different factual statement. Nor did it offer a statement of additional facts supported by admissible evidence. We conclude pursuant to the Local Rule that Mayflower has admitted all of the material facts asserted by the owner-operators.

Mayflower is an "authorized carrier" under federal law, which transports property in interstate commerce. 49 C.F.R. § 376.2(a). Mayflower conducts much of its business through agents nationwide. Ordinarily, Mayflower's agents provide transportation services to consumers ("shippers" in industry parlance) by using equipment that is leased from individuals who own and operate their own equipment. The owner-operators engaged by Mayflower's agents are called "agent van operators." Mayflower also engages owner-operators directly; these are called "contract truck men." We refer to the relevant group throughout as "owner-operators."

The relationship between the owner-operators and Mayflower or Mayflower's agents is regulated by leases governed by federal regulations. 49 C.F.R. Part 376. The lease agreements governing the relationship between carriers and owner-operators are comprehensive and detailed. All of the lease agreements at issue in this litigation include provision for fuel-tax

credit accounts. The purpose of those accounts is to distribute to the respective states the amounts that each owner-operator owes in fuel taxes to each state in which he either purchases fuel or in which he consumes fuel.

The states impose a tax on fuel purchase and/or consumption (the latter of which is based on mileage traveled within the state). The states collect their tax on fuel *purchases* at the pump. They collect the tax on *consumption* by another method described shortly. As we noted in our earlier entry, a driver traveling from east to west may purchase fuel near the western border of Indiana, travel through Illinois without purchasing fuel, and then refuel near he eastern border of Iowa. If fuel taxes were based solely on the state of *purchase,* Illinois will have received no tax, even though the driver has driven across its breadth and will have *consumed* considerable fuel in passing through it. Accordingly, the driver will have "underpaid" taxes in Illinois. By the same token, he may have "overpaid" in Indiana and in Iowa, the states in which he has actually purchased fuel but drove fewer miles. *OOI-DA v. Mayflower Transit, Inc.,* 204 F.R.D. 138, 142 (S.D.Ind.2001).

The owner-operators are individually responsible for paying fuel taxes. They do not, however, pay the taxes directly. Pursuant to the International Fuel Tax Agreement ("IFTA"), which governs the collection and distribution of fuel taxes, they provide Mayflower with driver logs and fuel purchase records, which Mayflower then uses to calculate the taxes they owe; Mayflower then prepares and files tax reports with its "Base Jurisdiction"—Indiana until 1998 and Missouri thereafter—on a fleet-wide basis. Mayflower makes a cash payment for any fuel taxes owed in excess

Mayflower unlawfully refused to rebate the     moneys deducted from their compensation."

of the amounts already paid by owner-operators at the gas pump.

Mayflower (either directly or through its agents) then charges the owner-operators on a state-by-state basis for any additional fuel taxes due to each state; these charge-backs are then reflected on the owner-operator's settlement statement and deducted from their compensation on a current basis. But *credits* due to an owner-operator for *overpayment* of fuel taxes in particular states are not credited to the owner-operators' statements. Instead, Mayflower retains them as a "credit carry-over balance" for as long as the driver continues his relationship with Mayflower plus three years. Moreover, a credit accrued to an owner-operator in a particular state will be used by Mayflower only to offset additional fuel taxes due to that state in future fuel tax reporting periods. Mayflower does not apply a "carry-over" credit that an owner-operator may have in one state to that owner-operator's tax obligation in another state.

The result of these practices is that, at any particular moment, an owner-operator's total tax credits may be greater than his total tax liability and that Mayflower retains the difference. It is uncontested on the record that Mayflower retains these tax credits for three years after an owner-operator terminates its relationship with Mayflower or its agents. Even then, Mayflower returns the credits only to an owner-operator that does not owe money to Mayflower for any other purpose. Additionally, when a credit is made, it is charged to the agent's statement, not to the owner-operator, and Mayflower does not ensure that the credit is returned to the owner-operator who paid the taxes. Mayflower pays no interest on the fuel tax credits that it has retained. Instead, it enjoys the time-value of the moneys that it carries over in fuel tax credits.

## II. *Discussion.*

### A. *Summary Judgment.*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. See *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that the party opposing summary judgment will be unable to satisfy the legal requirements necessary to establish its case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Waldridge*, 24 F.3d at 920.

B. *The Owner–Operators' Claim Pursuant to Truth in Lending Regulations.*

■ Mayflower does not contest the material facts, including that it collected moneys from owner-operators earmarked for tax payments and that it retained the moneys for three years and longer (and in all instances for more than forty-five days) after the expiration of owner-operator leases with Mayflower's agents. It follows that the plaintiffs have satisfied their burden on the first issue on summary judgment: there is no genuine issue of material fact for a jury to resolve. The only remaining issues are those relating to the second question on summary judgment: whether the plaintiffs are entitled to judgment as a matter of law. We conclude that they are.

The owner-operators argue that Mayflower's practices violate two leasing regulations: the requirement that a carrier compensate owner-operators within 15 days after submission of the necessary paperwork, 49 C.F.R. § 376.12(f);[2] and the requirement that the carrier return funds held in escrow within 45 days of the termination of a lease. 49 C.F.R. §§ 376.2($l$), 376.12(k)(6).[3]

Mayflower presents three basic arguments in opposition:[4] (1) it does not re-

---

2. Section 376.12(f) provides in pertinent part: "The lease shall specify that payment to the lessor shall be made within 15 days after submission of the necessary delivery documents and other paperwork concerning a trip in the service of the authorized carrier. The paperwork required before the lessor can receive payment is limited to log books required by the Department of Transportation and those documents necessary for the authorized carrier to secure payment from the shipper."

3. Section 376.12(k)(6) provides: "If escrow funds are required, the lease shall specify: ... The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor or all such final deductions made to the escrow fund. *The lease shall further specify*

*that in no event shall the escrow fund be returned later than 45 days from the date of termination.*" [Emphasis added.]

4. We note in passing that Mayflower also offers other arguments, but we interpret those in the context of its opposition to class certification. Thus, it argues that the tax codes in the various states are different and complicated, computing the amounts owed by each owner-operator is difficult and cumbersome, and it cannot compute with sufficient precision precisely how much might be owed to any particular owner-operator at any time, so that damages are difficult, if not impossible, to calculate. These arguments, even if true— while perhaps well-designed to oppose class certification—are not pertinent to the owner-operators' motion for summary judgment and are moot in view of our certification of the classes. Additionally, even if damages will be difficult to calculate, the motion for summary judgment goes to the question of liability, and

tain the fuel tax credits in "escrow" accounts for purposes of sections 376.2($l$), because the funds are not "deposited by the lessor"; (2) the fuel tax credits are not subject to return within the fifteen days specified by section 376.12(f) because the "payment" described by that provision is not compensation to owner-operators that is contemplated by that regulation; and (3) it retains the fuel tax credits for three years out of self-protection, because the statutes of limitations on its liability for taxes owed in both Indiana and Missouri is three years.

*Escrow Funds.* The Regulations, 49 C.F.R. § 376.2($l$), define an "escrow fund" as: "Money deposited by the lessor with either a third party or the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee." Mayflower argues that it does not retain the fuel tax credits in an "escrow fund" because the owner-operators do not "deposit" the funds with Mayflower.

At the same time, however, Mayflower urges us to rule against the owner-operators' motion for summary judgment on their conversion claim because "the control by Mayflower or its agents of the tax credits is authorized by the contractual terms of the lease agreements." Def. Opp. p. 27. It argues: the "owner-operators knowingly and willfully signed these [lease] agreements and *thereby consented to retention by Mayflower* or an agent of any credits to the extent provided by the agreements." *Id.* (emphasis added). In other words, Mayflower acknowledges that the owner-operators authorized it (or its agents) to retain the credits, pursuant to

the leases, for the purpose of paying taxes. This acknowledgement squares with the definition of an escrow fund.

Mayflower cannot have it both ways: it cannot argue both that the owner-operators expressly authorized it (or its agents) to retain the tax credits pursuant to their lease agreements, *and* that Mayflower did not retain the credits in an "escrow" account. Nor can it explain the inconsistency as pleading in the "alternative." Mayflower's defenses to both the Truth in Leasing claim and the conversion claim is that it retained the fuel tax credits lawfully because it was authorized to do so.

We conclude that Mayflower retained the fuel tax credits in an escrow fund, which entails that those credits were refundable to the owner-operators within forty-five days after termination of the leases. We further conclude that, while § 376.12(k)(6) permits Mayflower to "deduct monies for those obligations incurred by the lessor which have been previously specified in the lease," this provision limits such deductions in this case to fuel taxes, since they are the "obligations" which were incurred by the owner-operators as "specified in the lease."

■ *Compensation.* Mayflower next argues that its retention of fuel tax credits beyond fifteen days does not violate the regulations because the regulations do not contemplate fuel tax credits as "payment" within the meaning of § 376.12(f). We agree that the fuel tax credits are not subject to the "payment" due within fifteen days after Mayflower receives the necessary papers.

First, it is unreasonable to conclude that the Interstate Commerce Commission created a conflict between two provisions, one calling for a fifteen day period for the

not damages. Plaintiffs have expressed their willingness to accept Mayflower's own ac-

counting for purposes of summary judgment.

payment of compensation (including tax credit carry-overs)and another calling for a forty-five day period for the return of amounts held in escrow (including tax credit carry-overs). We must "avoid conflicts between overlapping statutory regimes," *Pittsburgh & Lake Erie R. Co. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 492, 109 S.Ct. 2584, 2587, 105 L.Ed.2d 415 (1989), particularly where, as here, a conflict is not necessitated by the plain language of the regulations. The obvious conclusion is that the two provisions cover different elements. In the "Lease and Interchange of Vehicles," 131 M.C.C. 141 (January 9, 1979), cited by the owner-operators (and included as Pl. Exs. E and Q), the Commission refers to the section that became § 3765.12(f) as "payment by authorized carriers to lessors for transportation services rendered." Although we agree with the owner-operators that the repayment of fuel taxes held in escrow affects the owner-operators' "compensation" broadly speaking, we conclude that repayment of fuel taxes is not contemplated in the payment to lessors "for transportation services rendered."

Similarly, our conclusion that the fuel tax credits are not subject to § 376.12(f) results from our conclusion that the parties have effectively agreed that Mayflower will maintain the fuel tax credits in escrow accounts. Since the parties have, in their leases and by their actions, manifested an intent to treat fuel tax credits as escrow funds, those credits are subject to § 376.12(k), including its forty-five day refund requirement.

*Indiana and Missouri Statutes of Limitations.*

■ Mayflower appears to argue that it was justified in retaining the fuel tax credits for three years because both Indiana and Missouri (the pertinent Base Jurisdictions) specify three-year statutes of limitations on tax liability. Accordingly, by retaining the funds for three years, Mayflower assures itself of the ability to pay any taxes owing to later adjustments or claims by the states. Mayflower points to no law or regulation that provides for such justification and we see no legal basis for it. The escrow regulation clearly and unambiguously provides for refund within forty-five days after the termination of the leases and nowhere hints at an exception based on the carrier's potential tax liability to the states.

Even if the states' three year limitation period justified Mayflower's retention of the credits (which it does not), it still does not explain why Mayflower retains the credits for three years (and more) after the owner-operator terminates his relationship with Mayflower. Even under Mayflower's theory, since Mayflower reports tax obligations on a quarterly basis, it might have retained the credits only for rolling three-year periods after each quarterly report.[5]

In sum, we GRANT the owner-operators's motion for summary judgment with respect to their claim that Mayflower violated the Truth in Leasing Regulations by unlawfully retaining fuel tax credits owing to the owner-operators for a period of more than forty-five days after the owner-operators' leases with Mayflower or its agents terminated.

C. *The Owner–Operators' Conversion Claim.*

■ The owner-operators also seek summary judgment on their conversion

---

**5.** Effective December 1, 1999, Mayflower altered its practice prospectively. It advised its agents that it would thereafter return the credits for the over-purchases of fuel on a current basis. But Mayflower would still retain the credits that were carried over prior to this time until three-years from the termination of the lease relationships.

claim, alleging that Mayflower retained unauthorized possession of the fuel tax credits. For the following reasons, we DENY plaintiffs' motion for summary judgment on the conversion claim.

Indiana's conversion statute, Indiana Code § 35–43–4–3, provides: "A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor." The law of conversion also contains a civil component. Pursuant to Indiana Code § 34–32–3–1, a person who suffers pecuniary loss as a result of another's conversion of his property may bring a civil action including, among other things, treble damages and reasonable attorney fees.

In order to prevail on its conversion claim, the owner-operators must prove two essential elements: that Mayflower's control over its property was unauthorized; and that the unauthorized control was knowing and intentional. *Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind.Ct.App. 1999), *trans. denied.* Control is "unauthorized" when it is either "without the other person's consent" or "in a manner or to an extent other than that to which the other person has consented." Ind.Code § 35–43–4–1.

Manifestly, Mayflower (or its agents) held authorized control over the fuel tax credits. No more than Mayflower may the owner-operators have it both ways: the fuel tax credits were held by Mayflower (or its agents) in escrow accounts pursuant to lease provisions *but* Mayflower exerted unauthorized control over those funds. The owner-operators' more plausible argument is that Mayflower's exercise of control exceeded the extent to which the owner-operators agreed.

Mayflower asserts that, even if its control was (or became) unauthorized, the owner-operators have presented legally insufficient evidence to show conclusively that Mayflower "knowingly" or "intentionally" exerted unauthorized control over their property. We agree. According to Indiana Code Section 35–4–1–2–2: "(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. [And (b) ] A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Mayflower may plausibly explain to a jury that it had a good faith belief that its practices were in compliance with the lease provisions and with federal regulations.

Where, as here, the plaintiffs seek summary judgment on an issue on which they bear the burden of persuasion, their evidentiary burden is substantial. The owner-operators have presented insufficient evidence of intentional or knowing misconduct. Indeed, their argument for conversion rests heavily on the notion that Mayflower is smart enough to read the regulations and infer from them that it may not lawfully retain the tax credits beyond forty-five days. Since Mayflower violated the regulations, it must have done so intentionally or knowingly. Such argument cannot substitute for evidence. In sum, we cannot find as a matter of law that Mayflower knowingly or intentionally exerted unauthorized control over the fuel tax credits. Accordingly, the owner-operators' motion for summary judgment on their conversion claim is denied.

## IV. *Conclusion.*

For the reasons discussed, we GRANT plaintiffs' motion for summary judgment on their fuel credits claim but DENY their motion with respect to their conversion claim.

It is so ORDERED this ____ day of October 2002.