In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1777

Katie Arsberry, et al.,

Plaintiffs-Appellants,

v.

State of Illinois, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 99 C 2457--William J. Hibbler, Judge.

Argued December 5, 2000--Decided March 19, 2001

   Before Posner, Easterbrook, and Evans,
Circuit Judges.

   Posner, Circuit Judge.  This is a suit by
Illinois prison and jail inmates,
inmates' family members (and other
intimates of the inmates), and a public-
interest law firm that specializes in the
defense of inmates on death row in
Illinois. Grounded in 42 U.S.C. sec.
1983, the Sherman Act, and Illinois state
law, the suit attacks the practice by
which each prison and jail grant one
phone company the exclusive right to
provide telephone service to the inmates
in return for 50 percent of the revenues
generated by the service. The suit claims
that the rates for the service, which are
collect only and are contained in tariffs
filed by the phone companies with the
Federal Communications Commission and the
Illinois Commerce Commission, are
exorbitant, being far higher than
required to cover the costs involved in
providing phone service to inmates. The
plaintiffs seek damages and injunctive
relief against the phone companies and
the state agencies and officials
responsible for the arrangements with the
companies. The district court dismissed

the suit as beyond its jurisdiction by reason of the filed-rate and primary-jurisdiction doctrines.

There are a number of jurisdictional bars or quasi-jurisdictional bars (by the latter term we mean defenses that a court can invoke even if the defendant has not done so, see, e.g., Higgins v. Mississippi, 217 F.3d 951 (7th Cir. 2000)) to various pieces of this suit, quite apart from the ones identified by the district court. The State of Illinois is not a person within the meaning of section 1983. E.g., id. at 953; Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989). The individual defendants have qualified immunity from the damages claims, given the novelty of the suit. The law firm has no standing to sue because there is no indication that it has suffered any detriment from the high price of its phone conversations with its clients; the cost of these phone calls is, at least so far as its counsel is aware, an expense that the firm is reimbursed for by the state or federal government. And the inmate plaintiffs are barred from suing because they have failed to exhaust their administrative remedies, as required by the Prison Litigation Reform Act. 42 U.S.C. sec. 1997e(a); Massey v. Wheeler, 221 F.3d 1030, 1034 (7th Cir. 2000); Perez v. Wisconsin Dept. of Corrections, 182 F.3d 532, 535-38 (7th Cir. 1999); Nyhuis v. Reno, 204 F.3d 65, 71 (5th Cir. 2000); Alexander v. Hawk, 159 F.3d 1321, 1323-28 (11th Cir. 1998); Brown v. Toombs, 139 F.3d 1102, 1104 (6th Cir. 1998) (per curiam). The plaintiffs say they have no such remedies against exorbitant phone bills, but the cases we have cited reject a "futility" exception to the requirement of exhaustion. We have left open the possibility of an exception to the exception for cases in which the only relief sought is monetary and is beyond the power of the prison authorities to give. Davis v. Streekstra, 227 F.3d 759 (7th Cir. 2000). That possible exception is unavailable to these plaintiffs, because they are seeking injunctive as well as monetary relief.

But since these various grounds do not dispose of all the plaintiffs or all the defendants, we proceed to consider whether the district court was right to think that the filed-rate and primary-

jurisdiction doctrines place the entire suit outside the jurisdiction of the district court. The filed-rate doctrine, which is based both on historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently, and on a policy of forbidding price discrimination by public utilities and common carriers, forbids a court to revise a public utility's or (as here) common carrier's filed tariff, which is to say the terms of sale that the carrier has filed with the agency that regulates the carrier's service. AT&T Co. v. Central Office Telephone, Inc., 524 U.S. 214, 223 (1998); Maislin Industries, U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126 (1990); Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78 (1981); Cahnmann v. Sprint Corp., 133 F.3d 484, 487 (7th Cir. 1998); Wegoland Ltd. v. Nynex Corp., 27 F.3d 17 (2d Cir. 1994). A customer or competitor can challenge the tariff before the agency itself, and if disappointed with the agency's response can seek judicial review, 47 U.S.C. sec.sec. 204(a) (2)(C), 402, but it cannot ask the court in any other type of suit (such as this civil rights and antitrust suit) to invalidate or modify the tariff. Nor can it seek damages based on the difference between the actual tariff and a hypothetical lawful tariff. That would require the court to determine the lawful tariff, and this is not regarded as a proper judicial function. Wegoland Ltd. v. Nynex Corp., supra, 27 F.3d at 19-21.

The plaintiffs deny that they are challenging tariffs. They say their objection is to the deals by which the correctional authorities in Illinois have granted exclusive rights to telephone companies in return for what the plaintiffs characterize as kickbacks. They want to dissolve the deals in the hope that competition among phone companies will lead companies to file prison tariffs that have lower rates. They point out that a conspiracy to file (or not file) particular tariffs is not insulated by the filed-rate doctrine from attack under the antitrust laws or other sources of independent rights, Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 422 and n. 28 (1986); United States v. Radio Corp. of America, 358 U.S. 334, 346-47 (1959); Georgia v.

Pennsylvania Railroad Co., 324 U.S. 439, 455 (1945); United States v. Pacific & Arctic Ry. & Navigation Co., 228 U.S. 87, 104-05 (1913); City of Mishawaka v. Indiana & Michigan Electric Co., 560 F.2d 1314, 1323 (7th Cir. 1977); Town of Norwood v. New England Power Co., 202 F.3d 408, 419-20 (1st Cir. 2000); Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 679 (9th Cir. 1985), provided that only injunctive relief is sought. Square D Co. v. Niagara Frontier Tariff Bureau, Inc., supra; Keogh v. Chicago & Northwestern Ry., 260 U.S. 156 (1922). Such an attack does not seek to invalidate any tariff, but merely to create an environment in which the regulated firm is more likely to file a tariff that contains terms more favorable to customers. Whether what the plaintiffs are attacking here is aptly described as a "conspiracy" remains to be considered; provisionally, however, the suit is not barred by the filed-rate doctrine.

The doctrine of primary jurisdiction is not a bar either. The doctrine is really two doctrines. In its central and original form, in which it is more illuminatingly described, however, as "exclusive agency jurisdiction," it applies only when, in a suit involving a regulated firm but not brought under the regulatory statute itself, an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve, although it will usually be subject to judicial review. United States v. Western Pacific R.R., 352 U.S. 59, 64 (1956); Cahnmann v. Sprint Corp., supra, 133 F.3d at 487; Advance United Expressways, Inc. v. Eastman Kodak Co., 965 F.2d 1347, 1352-53 (7th Cir. 1992); City of Peoria v. General Electric Cablevision Corp., 690 F.2d 116, 121-22 (7th Cir. 1982). When such an issue arises, the suit must stop and the issue must be referred to the agency for resolution. If the agency's resolution of the issue does not dispose of the entire case, the case can resume subject to judicial review of that resolution along whatever path governs review of the agency's decisions, whether back to the court in which the original case is pending or, if the statute governing review of the agency's decisions designates another court, to that court. Id. at 122; 2 Kenneth Culp Davis & Richard J. Pierce, Jr.,

Administrative Law Treatise sec. 14.1, pp. 272-80 (3d ed. 1994).

If the plaintiffs in this case wanted to get a rate change, the version of the doctrine that we have described would kick in; but they do not, so it does not. Eventually they want a different rate, of course, but at present all they are seeking is to clear the decks--to dissolve an arrangement that is preventing the telephone company defendants from competing to file tariffs more advantageous to the inmates. We are oversimplifying, because the complaint includes a claim under the Federal Communications Act, 47 U.S. sec.sec. 151 et seq., that the phone companies charge unreasonably high rates and also engage in rate discrimination. These claims are squarely within the FCC's jurisdiction, but have been forfeited. They are not mentioned in the plaintiffs' opening briefs, and are merely brushed in their reply brief.

The doctrine of primary jurisdiction is sometimes defined quite differently, as a doctrine that allows a court to refer an issue to an agency that knows more about the issue, even if the agency hasn't been given exclusive jurisdiction to decide it. So, for example, we read in National Communications Ass'n, Inc. v. AT&T Co., 46 F.3d 220, 222-23 (2d Cir. 1995), that "the doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." This definition obscures the core of the doctrine, described earlier. Cases in which a court refers an issue to an agency because of the agency's superior expertise, such as the case just cited and American Automobile Manufacturers Ass'n v. Massachusetts Dept. of Environmental Protection, 163 F.3d 74, 81, 83 (1st Cir. 1998), rather than because of the agency's jurisdiction, are not felicitously described as cases of primary jurisdiction. They are akin to those Burford abstention cases that like the granddaddy of the line, Burford v. Sun Oil Co., 319 U.S. 315, 332-34 (1943), itself, or the more recent New Orleans Public Service, Inc. v. Council of City

of New Orleans, 491 U.S. 350, 361 (1989), concern arcane regulatory issues; or cases in which the court solicits an amicus curiae brief from an interested agency; or cases in which the court has in effect appointed the agency to be a special master-- an analogy embraced in Lodge 1858, American Federation of Government Employees v. Webb, 580 F.2d 496, 508-09 (D.C. Cir. 1978). In such cases, either court and agency have concurrent jurisdiction to decide an issue, or only the court has the power to decide it, and seeks merely the agency's advice. (In the core of the doctrine, in contrast, the court has jurisdiction of the case, but the agency of the issue.) That model doesn't fit this case either. The FCC has no authority to approve a collusive arrangement among telephone companies; nor is there any indication that it knows anything that would be useful in evaluating the claim of collusion.

Prudently the defendants have not rested wholly on jurisdictional or procedural grounds for the dismissal of this suit, but have argued that the plaintiffs' claims lack merit. They are right. Consider first the claim that exorbitant telephone rates violate the First Amendment. It is true that communications the content of which is protected by the First Amendment are often made over the phone, but no one before these plaintiffs supposed the telephone excise tax an infringement of free speech. Saltzman v. United States, 516 F.2d 891 (9th Cir. 1975) (per curiam). Communications protected by the amendment are also frequently made by printing words on paper, yet no one supposes that the consequence is to bring the corporate income tax, when imposed on manufacturers of paper, within the purview of the First Amendment, or even to forbid taxing those manufacturers more heavily than manufacturers of products that are less important as inputs into the production of communications media. Any regulation direct or indirect of communications can have an effect on the market in ideas and opinions, but that possibility in itself does not raise a constitutional issue. Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 581-83 (1983); BellSouth Corp. v. F.C.C., 144 F.3d 58, 69 (D.C. Cir. 1998). Otherwise the entire tax and regulatory operations of American

government would be brought under the rule of the First Amendment.

There is no suggestion that the scheme of which the plaintiffs complain is motivated by a desire to limit free speech, as in Grosjean v. American Press Co., 297 U.S. 233 (1936); the plaintiffs themselves contend that it is motivated by pure greed; and of course the telephone rates of which they complain are independent of the protected or unprotected character of the phone calls being charged for. We note parenthetically that "greed" doesn't seem the right characterization either, considering that prisons are costly to build, maintain, and operate, and that the residents are not charged for their room and board. By what combination of taxes and user charges the state covers the expense of prisons is hardly an issue for the federal courts to resolve.

The case is a bit closer to Minneapolis Star, which invalidated a special tax arbitrarily imposed on newspapers. Yet to extend that decision to the telephone excise tax, or to the "tax" imposed by the contracts attacked in this case, would overlook a vital distinction. The entire content of newspapers, in contrast to telephone calls, is protected by the First Amendment; and so there was in the Minneapolis Star case a gratuitous and potentially substantial, even if not deliberate, impairment of the interests that the amendment is designed to protect. Although the telephone can be used to convey communications that are protected by the First Amendment, that it is not its primary use and it is extremely rare for inmates and their callers to use the telephone for this purpose. Not to allow them access to a telephone might be questionable on other grounds, but to suppose that it would infringe the First Amendment would be doctrinaire in the extreme, United States v. Footman, 215 F.3d 145, 155 (1st Cir. 2000), though the Ninth Circuit disagrees. Johnson v. California, 207 F.3d 650, 656 (9th Cir. 2000) (per curiam). The telephone, and the nation's telecommunications infrastructure more generally, are more commonly used for First Amendment purposes than prison phones are, but the federal courts do not use that fact as the excuse to bring the taxation and regulation of

telecommunications under comprehensive judicial surveillance in the name of free speech.

The plaintiffs also argue that the kickback scheme, as they regard it, impairs contracts to which the plaintiffs are parties. No contracts are specified; and in any event a tax, which is what the allegedly exorbitant component of the questioned telephone rates functionally is, is not an impairment of contracts within the meaning of the Constitution. Barwise v. Sheppard, 299 U.S. 33, 40 (1936); Kehrer v. Stewart, 197 U.S. 60, 70 (1905); North Missouri R.R. v. Maguire, 87 U.S. 46, 61 (1873). The cases that establish this proposition are old, but that is only because it's been a long time since anyone thought to make the argument. And the contention that by charging a high price for phone calls the defendants have taken the plaintiffs' property and must pay just compensation is downright absurd.

There is a little more substance to the argument that the scheme violates the equal protection and due process clauses of the Fourteenth Amendment. We must take the facts pleaded in the complaint as true, and they are that the very high price charged anyone who wants to talk to an inmate over the phone is greatly in excess of any additional cost to the phone companies or the prisons and jails of allowing inmates to make collect calls. Treating what we have called the exorbitant component of the prison inmate tariffs as a tax, we may appear to have a conventional case in which a class of taxpayers complains about a grossly discriminatory tax rate. Allegheny Pittsburgh Coal Co. v. County Commission, 488 U.S. 336, 345 (1989); Metropolitan Life Insurance Co. v. Ward, 470 U.S. 869, 875 (1985); Rinaldi v. Yeager, 384 U.S. 305, 308 (1966); Wallers v. United States, 847 F.2d 1279, 1282 (7th Cir. 1988). But here the fact that it is not a tax but a tariffed rate bites. A claim of discriminatory tariffed telephone rates is precisely the kind of claim that is within the primary jurisdiction of the telephone regulators. The plaintiffs are asking us to compare the rates on inmate calls with rates on comparable calls of other persons; that is what we cannot do but the regulatory agencies can.

The plaintiffs argue that inmates and their families have an interest encompassed by the concept of "liberty" in the due process clause and that the defendants (both the agencies and officials directly subject to the Fourteenth Amendment and the telephone companies, which are liable under section 1983 as their coconspirators, Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Tarpley v. Keistler, 188 F.3d 788, 791-92 (7th Cir. 1999)) have arbitrarily deprived them of that interest by preventing competition for inmate phone service. It is conceivable (no stronger statement is possible in the current state of the case law) that the constitutional concept of liberty may encompass a limited right to make or receive prison visits involving family members, Burgess v. Lowery, 201 F.3d 942, 947 (7th Cir. 2000); Froehlich v. Wisconsin, 196 F.3d 800, 801-02 (7th Cir. 1999); Mayo v. Lane, 867 F.2d 374, 375-76 (7th Cir. 1989), and a telephone call is an electronic visit and may be the only form of visit that is feasible if the family lives far from the inmate's prison. But even if this is so, which we needn't decide, the plaintiffs cannot get anywhere with their due process claim. The claim has no procedural dimension; there is no suggestion that the defendants have denied them their due process right to challenge the inmate telephone rates in the regulatory agencies. The claim is substantive, is that the defendants have unreasonably curtailed the liberty of being visited and visiting by denying reasonably priced phone service. And as a substantive claim it cannot fly. It is no different from claiming that a state that raised the gasoline tax and by doing so increased the cost to the plaintiffs of traveling to visit their inmate relatives would be violating the Constitution.

We are also unimpressed by the plaintiffs' antitrust claim. Were they arguing that the defendant phone companies had gotten together to divide the inmate phone market, using state officials as their cat's paws, the defendants, in order to avoid liability, would have to show that the initiative for and control over the scheme resided with the officials, acting in furtherance of a state policy of limiting competition. Southern Motor Carriers Rate

Conference, Inc. v. United States, 471 U.S. 48, 56-57 (1985); California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105-06 (1980); Hardy v. City Optical Inc., 39 F.3d 765, 768 (7th Cir. 1994); Massachusetts Food Ass'n v. Massachusetts Alcoholic Beverages Control Comm'n, 197 F.3d 560, 563-64 (1st Cir. 1999). There is a bare hint of horizontal agreement--the sort of thing that the Georgia v. Pennsylvania line of cases that we cited earlier holds are not protected from antitrust attack by the filed-rate doctrine--in the allegation of the complaint that the telephone company defendants and the other defendants are acting "jointly and in concert." But the entire thrust of the plaintiffs' argument is that the prisons are principals, not tools; remember, they are said to be motivated by greed, but greed that is institutional rather than personal. Far from being mere agents of the phone companies, the prisons are in the driver's seat, because it is they who control access to the literally captive market constituted by the inmates.

Indeed the plaintiffs' real argument has nothing to do with any horizontal conspiracy; it is rather that a monopolist, namely the State of Illinois (and its subdivisions), exercising as it does an iron control over access to the inmate market, has rented pieces of the market to different phone companies, in much the same way that an airport will charge a high fee to concessionaires eager to sell to the captive market represented by the airline passengers who perforce spend time in the airport. Cf. Elliott v. United Center, 126 F.3d 1003 (7th Cir. 1997). The concessionaires will pass on much of the fee to their customers, who will thus pay a higher than competitive price. States and other public agencies do not violate the antitrust laws by charging fees or taxes that exploit the monopoly of force that is the definition of government. They have to get revenue somehow, and the "somehow" is not the business of the federal courts unless a specific federal right is infringed. Nor do the persons with whom the states contract violate the antitrust laws by becoming state concessionaires, provided those persons do not collude among themselves or engage in other anticompetitive behavior, of which charging high prices as a state

concessionaire is not a recognized species.

Insofar as the plaintiffs' concern is with the purely vertical arrangement between each defendant telephone company and a particular prison or jail, the filed-rate doctrine pops back in as a jurisdictional bar. The vertical agreement is effectively the tariff, that is, the contract between the provider of the regulated service (the phone company) and the customer. Technically, the inmates are the customers; but realistically it is the prisons and jails. The plaintiffs don't want to clear away an obstacle to a voluntarily negotiated lower tariff; they want a lower tariff.

The dismissal of the plaintiffs' federal claims must be affirmed, though on the merits rather than (with the exception of the equal protection claim, which is within the scope of the doctrine of primary jurisdiction in its core sense of exclusive agency jurisdiction to decide an issue, and the vertical dimension of the antitrust claim, which is barred by the filed-rate doctrine) on jurisdictional grounds. Since all the plaintiffs' federal claims have fallen out well before trial and their state claims are not even mentioned in the district court's opinion, we direct that court to relinquish jurisdiction over the state claims. 28 U.S.C. sec. 1367(c)(3). Doubtless the court would have done that on its own had it not thought the entire case outside its jurisdiction, which is why it had no occasion even to mention those claims.

Modified and Affirmed.